UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
ANTHONY JOSEPH GRACE,
                                    :
        Plaintiff,                          **Report & Recommendation**
                                    :
        -against-                   11 Civ. 9162 (ALC)(MHD)
                                    :
MICHAEL ASTRUE,
Commissioner of Social Security, :

        Defendant.                 :
--------------------------------x

TO THE HONORABLE ANDREW L. CARTER, U.S.D.J.:


    Plaintiff Anthony Grace filed this action pursuant to

section 205(g) of the Social Security Act ("the Act"), as

amended, 42 U.S.C. § 405(g), to challenge a final decision of

the Social Security Administration ("SSA") denying his

application for disability insurance benefits. He claims that he

has been disabled since November 15, 2008 -- approximately six

weeks before his insurance coverage expired on December 31, 2008

-- as the result of depression, severe headaches, and chronic

lower back pain. (Admin. R. Tr. ("Tr.") 35, 37, 189, 197, 201).

Defendant Commissioner of Social Security has moved for judgment

on the pleadings pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure. He asserts that denial of benefits was

supported by substantial evidence and based on applicable legal

standards. Plaintiff has also moved under Rule 12(c), arguing

1

that the decision of the Commissioner should be reversed. He seeks an order granting disability benefits from November 15, 2008 onward.

For the reasons below, we recommend that the case be remanded for further development of the record.

## I.   **Procedural History**

Plaintiff apparently began suffering from depression in 2004, and, following a series of unfortunate events, including a bout of severe pneumonia in 2007 and a fall from a ladder in November 2008, he reports that he was left completely disabled by the cumulative impact of his depression, chronic back pain, headaches, anxiety, fatigue, and mental fogginess. (See Tr. 43-54).

On June 19, 2009, plaintiff filed an application for disability insurance benefits with the Social Security Administration. (Id. at 189-90). The SSA denied his application on initial review, concluding that he was not disabled pursuant to the Act. (Id. at 91-96). Plaintiff subsequently requested an

2

administrative hearing to review this adverse determination. (Id. at 104-05).

The hearing before ALJ Roberto Lebron was adjourned twice. On the first scheduled date, neither Mr. Grace nor his attorney, Irwin B. Silverman, Esq., appeared. (Id. at 87). On the second scheduled date, approximately four months later, the testifying experts indicated that the medical evidence in plaintiff's file was too sparse to make a definitive medical evaluation. (Id. at 82). At the request of Mr. Silverman, the ALJ adjourned the hearing to allow for additional medical evidence to be collected in support of plaintiff's application. (Id. at 82-83, 93).

Finally, on March 11, 2011, Mr. Grace appeared with his attorney for a hearing before ALJ Lebron. (Id. at 33). Pat Green, an impartial vocational expert, also appeared in person, and Dr. Chandra Sekhar and Dr. Rita Clark testified via telephone as non-examining medical experts.

3

## II.  **The Pertinent Record**

### A. Plaintiff's Hearing Testimony

At the time of the hearing, plaintiff was 52 years old. (Id. at 32). He testified that before the onset of his alleged disability he was self-employed as the owner of A&S Improvements, a residential construction company that did home improvement work, including "roofing, siding, windows, doors, [ad]ditions, and decks." (Id. at 35). He also testified that he holds a B.S. degree in Business Administration. (Id. at 34).

Plaintiff testified that in 2007 he "got a real severe case of pneumonia and after that everything just kept going downhill," noting that the "pneumonia really beat [his] body… and then [he] took a fall off a ladder," in November 2008 (id. at 36), after which he apparently had to stop working because he "couldn't deal with the pain [in his lower back] anymore." (Id. at 35). Plaintiff further testified that he suffers from depression, constant headaches, and an inability to sleep at night. (Id. at 35-36).

Plaintiff described his back problems as "a constant, constant pain," like the "muscles are knotted." (Id. at 39). He also explained that the more active he is, "the tighter it goes and the further it travels up my back and down my legs in my buttocks." (Id.). According to Mr. Grace, the back pain gets worse when he engages in any kind of physical activity. (Id.). For instance, Mr. Grace said that if he walks or tries to lift anything, he experiences a "sharp pain." (Id.). Plaintiff explained that the pain continues all the time, and as a result he can sit only for periods of about half an hour. After that, it becomes "very uncomfortable." (Id.). As an example, he recounted the difficulty he experienced driving to the hearing: "with all the traffic on [Route] 287 today, I was dying coming over here. It wasn't even a half an hour ride." (Id.). ALJ Lebron asked if plaintiff's conditions affect his ability to walk. (Id. at 44). Plaintiff responded that he walks hunched over, and that walking causes him pain. (Id.). He further testified that if he walks a block or more, he experiences back spasms. (Id.). He reported that he can walk for a period of up to fifteen minutes and can stand in one place for up to ten minutes. (Id. at 45).

5

Plaintiff reported that he can bend, but that this, too, causes him a lot of pain. (Id. at 44). According to Mr. Grace, his conditions do not affect the use of his hands; he can make a fist with each hand and lift coins up from a table. (Id. at 45). He testified, however, that he is limited to lifting objects of no more than five pounds. (Id.).

In reference to regular daily activities, plaintiff testified that his wife performs the household cleaning, cooking and laundry. (Id. at 47-50). ALJ Lebron asked whether Mr. Grace could bathe, shower, and wash his hair, and he replied that he can do these tasks independently. (Id. at 48).

Plaintiff testified that he suffers from fatigue because of loss of sleep attributable to his back pain. (Id. at 29). When ALJ Lebron asked how many hours of sleep he gets a night, plaintiff responded, "maybe two hours of solid sleep... I haven't had an eight-hour sleep in probably eight years, and I used to sleep straight through the night and not even move." (Id. at 50). Plaintiff's attorney asked how his restlessness affects his functioning during the day. Plaintiff replied, "I always feel foggy, tired." (Id. at 51). He also indicated that

6

he takes three or four naps during the day that last twenty to thirty minutes. (Id. at 50-51).

Plaintiff recounted ongoing problems with anxiety, depression, and staying focused. (Id. at 37). According to Mr. Grace, his depression started around 2004 and, among other things, has contributed to his difficulty concentrating. (Id. at 53). Plaintiff's attorney asked how often the depression comes, and Mr. Grace said, "the depression is constant" and, because of this, "I have a real, real tough time staying focused on anything." (Id. at 37, 51). When asked if his back pain causes greater anxiety and depression, plaintiff responded, "Without a doubt." (Id. at 52).

Plaintiff testified that initially he had relied on his brother, Dr. John Grace, who is a psychologist, for help in guiding the treatment of his depression by his primary care physician, Dr. Feldfogel. (Id. at 42). As he explained, Dr. Feldfogel,

> was treating me [for depression] consulting
> back and forth with my brother; I just had a
> hard time believing that I needed to go to
> someone a psychiatrist or a psychologist,
> being that my brother was one, he kind of

7

> picked up on what I needed and saw what I
> needed…

(Id.). Plaintiff testified that, due to financial constraints, he was unable to consistently take the antidepressant medications that had been prescribed to him by Dr. Feldfogel at the recommendation of Dr. Grace. (Id. at 52).

Although plaintiff indicated that he does not like being around many people, he said that he "deal[s] with people very well." (Id. at 47).

Plaintiff also said that he suffers from shortness of breath and has the beginning stages of emphysema. (Id. at 48). In addition to this, he has acute sinusitis and a deviated septum. (Id. at 49). Mr. Grace testified that he smokes between a half a pack and a full pack of cigarettes per day. (Id.).

On the date of the hearing, Mr. Grace reported taking the following medications: (1) Venlafaxine, for depression; (2) Avelox, an antibiotic; (3) Ventolin; (4) Nexium, for reflux; and (5) Lidoderm patches, as needed, for pain. (Id. at 250). In

8

addition, plaintiff confirmed that he had previously been prescribed Vicodine to treat his pain. (Id. at 66).[1]

B. Medical Records: Treating & Examining Doctors

a. Dr. Feldfogel's Treatment Records

Plaintiff was treated by his primary care physician, Dr. Howard Feldfogel, from May 1995 through July 2009. (See id. at 368-419). Dr. Feldfogel's notes reflect, in somewhat cursory form, the doctor's examination results, diagnoses, and prescriptions from plaintiff's regular medical check-ups. (Id.). Dr. Feldfogel's notes indicate that plaintiff was experiencing symptoms of fatigue and depression as early as July 2004, although these diagnoses were typically noted in single-word form, such as "depression," without elaboration as to the underlying nature of plaintiff's complaints. (See, e.g., id. at 392). For the five-year period from July 2004 through July 2009, Dr. Feldfogel's treatment records consistently show that plaintiff suffered from ongoing depression. (See id. at 368-92).

---

[1]   During the hearing, reference was made to other prescriptions for muscle relaxers and anti-spasm pills, but these medications were not specified by name. (See Tr. 65).

9

A letter dated January 8, 2008 from plaintiff's brother, Dr. John Grace, appears in Dr. Feldfogel's treatment file and reports plaintiff's symptoms as daily depressed mood, hypersomnia, loss of interest, irritability, anxiety, and a diminished ability to perform daily activities. (Id. at 287). Dr. Grace's letter diagnosed plaintiff as having "Major Depressive Disorder, Single Episode, Moderate, Chronic" and "Dysthmic Disorder, Early Onset," as well as nicotine dependence, and recommended a new antidepressant prescription to treat him. (Id.).

Dr. Feldfogel's treatment record from January 15, 2008 noted that plaintiff was experiencing depression and anxiety, for which he was taking Lexapro. (Id. at 376). A subsequent treatment note by Dr. Feldfogel from February 20, 2008 indicates that, after switching to Effexor for treatment of his depression, plaintiff "fe[lt] better" and had "improved depression." (Id. at 375). Dr. Feldfogel's notes from July 14, 2008 indicate that plaintiff felt "'a little better' but still somewhat depressed," with decreased motivation. (Id. at 374).

Dr. Feldfogel's notes also reflect that plaintiff began complaining of low back pain in September 2008. (Id. at 372).

Dr. Feldfogel accordingly ordered radiographic scans of plaintiff's back. (See id. at 269-70). Radiologist Dr. Michael Lebowitz observed that x-rays of plaintiff's lumbosacral spine in November 2008 showed "no traumatic abnormality" and "no spondylolisthesis," and that "the SI joints and soft tissues are unremarkable." (Id. at 269). An accompanying report by radiologist Dr. Steven Klein indicated that an MRI study of plaintiff's lumbar spine showed degeneration of the L5-S1 disc, with "a small disc protrusion… but not compressing the thecal sac or S1 nerve roots in the lateral recesses." (Id. at 270).

Dr. Feldfogel also ordered blood work done on plaintiff in November 2008, the results of which were essentially normal and tested negative for Lyme disease. (Id. at 282-86). In December 2008, Dr. Feldfogel prescribed physical therapy to address plaintiff's low back pain, but his treatment notes indicate that plaintiff did not believe that he would be able to afford the treatment, since he was apparently uninsured. (Id. at 370). The doctor's treatment notes show that he examined plaintiff seven times between December 2008 and July 2009, and that plaintiff consistently complained of low back pain. (Id. at 368-70).

11

b. Dr. Feldfogel's July 2009 Report

In July 2009, Dr. Feldfogel completed a summary medical report for determination of disability that he submitted to SSA. (Id. at 271-79).[2] In that report, he estimated that plaintiff could lift up to ten pounds frequently and twenty pounds occasionally, could stand for about three hours per day, and could walk for about six hours per day. (Id. at 272). As a result of plaintiff's chronic low back pain, Dr. Feldfogel described plaintiff's ability to climb, crouch, squat, and to repeatedly stoop and bend for long periods as "abnormal." (Id.). He did not report any other physical abnormalities. He described plaintiff's mental abilities -- including his attention; concentration; orientation; ability to understand, remember and carry out instructions; ability to respond appropriately to co-workers and supervisors; ability to meet quality standards and production norms; and ability to sustain adequate attendance -- as within normal limits. (Id. at 272, 278).

---

[2] We infer that the July 10, 2009 report was intended to serve as a medical source statement ("MSS"). An MSS is a statement about a claimant's remaining abilities, in light of his or her impairments, that is provided by the claimant's medical source, and is to be based on the findings of that medical source. SSR 96-5p, 1996 WL 374183, at *4.

### c. Dr. Stephen Roithmayr

Plaintiff began seeing Dr. Roithmayr, a psychologist, in 2010 for treatment of his depression. (Id. at 42). Plaintiff visited Dr. Roithmayr a total of 19 times between July 2010 and late January 2011, and the doctor memorialized his diagnosis in a medical report and opinion dated January 24, 2011. (Id. at 501).

According to Dr. Roithmayr's report, plaintiff came to him reporting an inability to sleep, lack of focus, irritability, indecisiveness, down mood and a myriad of body pains. (Id.). Dr. Roithmayr diagnosed him with "depression with recurrent episodes" based on plaintiff's "history and presenting problems." (Id.). The doctor further opined that Mr. Grace was "unable since November 2008 to perform substantial gainful work of any kind because of symptoms associated with depression." (Id.).

### d. Dr. Rosenblatt

At the hearing, plaintiff also reported that he visits Dr. Rosenblatt, a pain management doctor, on a regular basis (id. at

13

28), and that Dr. Rosenblatt had prescribed him Lidoderm patches and physical therapy. (Id. at 41). The record does not contain any treatment records from Dr. Rosenblatt.

       e. Dr. John Grace

In support of his application for benefits, plaintiff submitted an undated letter report -- which was apparently transmitted via facsimile on August 20, 2009 -- from his brother, Dr. John Grace, a clinical psychologist licensed in the state of Georgia. (Id. at 421). In addition to his psychotherapy practice, Dr. Grace indicated that he also conducts SSI evaluations. (Id.). In his letter report, Dr. Grace indicated that, although he had not directly treated plaintiff due to ethical constraints presumably arising from the brothers' close familial relationship, he had nonetheless informally assessed and monitored plaintiff's symptoms from approximately the summer of 2006 forward, during which time he had recommended that plaintiff try various antidepressant medications, including Lexapro and, later, Effexor. (Id.). Dr. Grace noted that plaintiff was, in his opinion, "significantly depressed by spring 2007" and stated "I can affirm that he has made criteria for Depression and Dysthmia since at least 2005." (Id.).

14

C. Opinions From SSA's Medical Consultants

a. Dr. Rita Clark's Hearing Testimony

Dr. Rita Clark, a non-examining psychiatrist, testified at the hearing that there was enough medical evidence in the record to determine the existence of a psychiatric or a psychological impairment. (Id. at 56). In spite of this, she concluded that there was nothing to establish that any of plaintiff's conditions meet or equal a listed condition, which would define a per se disability. (Id.). Dr. Clark elaborated, stating that while Dr. Roithmayr's diagnosis would equal a listing as of the time of his report in January 2011, there was nothing in the record to suggest that plaintiff's psychological condition had been similarly disabling during the insured period. (Id. at 57-58). She made no mention of the findings or diagnoses of Dr. Grace.

ALJ Lebron asserted that Dr. Roithmayr's opinions are "not controlling unless [plaintiff] can show that he was under treatment prior to December 31, 2008." (Id.). Dr. Clark responded that plaintiff:

15

> was under treatment prior to that date by
> Dr. Feldfogel who prescribed an anti-
> depressant. However, he is not a
> psychiatrist. He would just write down the
> word 'depression,' but there were no
> corroborating observations or discussion of
> it... The problem I'm having is how severe
> and how disabling the depression was prior
> to the reports from Dr. Roithmayr.

(Id. at 57-58).

The ALJ expressed similar concern, observing that most of
the record of plaintiff's psychological treatment postdated the
expiration of plaintiff's insurance coverage. Dr. Clark agreed:

> Yes, and I find it plausible that of course
> his depression was present before. I just
> don't know how severe it was. There is
> nothing in the record to indicate that it
> was moderate or mild or perhaps severe, but
> the very fact that he was give[n] medication
> doesn't tell me that it was a very severe
> depression. People are medicated for mild
> depression as well.

(Id. at 58).

ALJ Lebron asked Dr. Clark if she could pinpoint the onset
of plaintiff's depression. She responded:

> That's where I have the difficulty because I
> do have Dr. Roithmayr in [exhibit] 13F who
> refers back to November of 2008 as the
> beginning of the series of events that

16

> impacted plaintiff adversely. These events
> include plaintiff falling off a ladder in
> November of 2008, and then falling on ice,
> but there is nothing specific to say when
> exactly it reached the level of severity
> that it evidently has today.

(Id. at 60).

With respect to plaintiff's ability to work as of the date of the hearing, Dr. Clark found that plaintiff has a "marked restriction of his activities of daily living." (Id. at 59). She also observed that he had moderate difficulty maintaining normal social functioning and had a marked difficulty in maintaining concentration. (Id.).

Ultimately, she concluded that plaintiff could not work because "at this time," he has "severe depression." (Id. at 58-59). Dr. Clark concluded that, in her medical opinion, plaintiff could not do simple routine and repetitive tasks. (Id. at 59). In making these findings, Dr. Clark primarily relied on Dr. Roithmayr's report. She also referred to Dr. Feldfogel's treatment records, but she indicated that she had only peripherally considered those records in assessing plaintiff's psychological condition. (Id. at 60).

17

Plaintiff's attorney asked Dr. Clark whether she agreed with Dr. Roithmayr's opinion that plaintiff cannot work because depression interferes with his sleep, concentration, and ability to make decisions. (Id. at 62). Dr. Clark said, "Yes. As of the current time." (Id.).

### b. Dr. Chandra Sekhar's Hearing Testimony

Dr. Chandra Sekhar, a non-examining internist, testified that the severity of any one of plaintiff's conditions, or a combination of them, did not meet or equal an administrative listing. (Id. at 66).

With respect to exertional limitations, Dr. Sekhar said that Mr. Grace has no limitations walking, can sit for six out of eight hours, can stand for six out of eight hours, can lift and carry twenty pounds occasionally and ten pounds regularly. She noted mild postural limitations, but no manipulative limitations with the use of his hands. (Id. at 68). Additionally, she did not report any visual or environmental restrictions. (Id.).

18

Although plaintiff testified to feeling foggy and tired during the day, Dr. Sekhar did not find support for this in the record. (Id. at 71). While plaintiff said he can sit for only fifteen minutes before feeling pain in his lower back, Dr. Sekhar asserted that he can sit for six out of eight hours. In light of these conflicting accounts, plaintiff's attorney questioned how Dr. Sekhar arrived at her finding. (Id. at 72). Dr. Sekhar's response to this question was ambiguous at best; apparently she was having difficulty hearing the questions presented to her over the phone. (See id. at 73). It appears, however, that Dr. Sekhar had relied on Dr. Feldfogel's 2009 summary report in assessing plaintiff's exertional limitations. (See id. at 67; 272).

Lastly, ALJ Lebron asked Dr. Sekhar whether plaintiff can do either sedentary, light, medium, or heavy work. (Id. at 74). She said, "He can do sedentary work and he can do walking and lifting and the restrictions are mild other than standing and sitting are painful to a certain extent, but relieved by change of posture, but he can do work accordingly." (Id. at 73).

c. Vocational Expert's Hearing Testimony

The hearing concluded with testimony from Pat Green, an impartial vocational expert. Ms. Green indicated that plaintiff had previously worked as a carpenter. (Id. at 75).

Based on Dr. Sekhar's estimation of plaintiff's exertional limitations, ALJ Lebron asked whether a person with those same limitations could do plaintiff's prior work and Ms. Green said "no." (Id. at 76-77). The following exchange ensued:

> ALJ Lebron: Now considering the limitations both physical and psychiatric and the fact that the claimant is 52 years of age and that he has a bachelor's degree in business administration and his prior work history, can such an individual do any other work.
>
> Pat Green: No your honor. He could not.

(Id. at 78).

Plaintiff's attorney then made a brief closing statement requesting that the ALJ rule in plaintiff's favor, after which the hearing ended.

20

### III. Standards for Disability Insurance Benefits Eligibility

In order to qualify for disability insurance benefits, a claimant must "demonstrate that []he was disabled as of the date on which []he was last insured." Behling v. Comm'r of Soc. Sec., 369 F. App'x 292, 294 (2d Cir. 2010) (citing 42 U.S.C. § 423(a)(1)(A)). For purposes of eligibility for benefits, an applicant is "disabled" within the meaning of the Act if he is unable "'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to... last for a continuous period of not less than 12 months.'"[3] Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 641-42 (2d Cir. 1983) (quoting 42 U.S.C. § 423(d)(1)(A)). The Act requires that the relevant physical or mental impairment be "'of such severity that [plaintiff] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004) (quoting 42 U.S.C. § 423(d)(2)(A)). If the claimant can perform substantial

_____

[3] "Substantial gainful activity" is defined as work that "[i]nvolves doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510; see, e.g., Craven v. Apfel, 58 F. Supp. 2d 172, 183 (S.D.N.Y. 1999); Pickering v. Chater, 951 F. Supp. 418, 424 (S.D.N.Y. 1996).

Please note

gainful work existing in the national economy, it is immaterial, for purposes of the Act, that an opening for such work may not be found in the immediate area where she lives or that a specific job vacancy may not exist. 42 U.S.C. § 423(d)(2)(A).

In assessing a claim of disability, the Commissioner must consider: "(1) objective medical facts; (2) diagnosis or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and experience." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988). The SSA regulations set forth a five-step sequential process under which an ALJ must evaluate disability claims. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920. The Second Circuit has described this sequential process as follows:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational

22

factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment,[4] the <u>fourth</u> inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.[5] <u>Finally</u>, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform." The burden of proving disability, encompassing the first four of these steps, is on the claimant. The

---

[4] If a claimant has a "listed" impairment, she will be considered disabled <u>per se</u> without an additional assessment of vocational factors such as age, education, and work experience. If the plaintiff does not have a listed impairment, the Commissioner must consider plaintiff's residual functional capacity, which is her ability to do physical and mental work activities on a sustained basis, despite limitations from her impairments. <u>See</u>, <u>e.g.</u>, <u>Bush v. Shalala</u>, 94 F.3d 40, 45 (2d Cir. 1996). To determine whether the applicant has a listed disorder, the ALJ must consult the relevant criteria for each listing. "The criteria in paragraph A substantiate medically the presence of a particular mental disorder" while "[t]he criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, App. 1, § 12(A).

[5] Residual functional capacity is a claimant's maximum remaining ability, despite her limitations, "'to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the residual functional capacity assessment must include a discussion of the individual's abilities on that basis.'" <u>Schultz v. Astrue</u>, 2008 WL 728925, at *6 (N.D.N.Y. Mar.18, 2008) (quoting <u>Melville v. Apfel</u>, 198 F.3d 45, 52 (2d Cir. 1999)). If a claimant has more than one impairment, all medically determinable impairments must be considered, including those that are not "severe." The assessment must be based on all relevant medical and other evidence, such as physical abilities, mental abilities, and symptomology, including pain and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a)(1)-(3).

burden of proving the fifth step is on the
Secretary.

Bush, 94 F.3d at 44-45 (emphasis in original) (quoting Rivera v.
Schweiker, 717 F.2d 719, 722-23 (2d Cir. 1983)); see Poupore v.
Astrue, 566 F.3d 303, 306 (2d Cir. 2009).


Normally, in meeting his burden on this fifth step, the
Commissioner may rely on the Medical-Vocational Guidelines
contained in 20 C.F.R. Part 404, Subpart P, Appendix 2, commonly
referred to as "the Grid[s]."[6] Zorilla, 915 F. Supp. at 667.
However, if a plaintiff suffers from non-exertional limitations,[7]

---

[6] "The Grid classifies work into five categories based on
the exertional requirements of the different jobs." Zorilla v.
Chater, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996).
"Specifically, it divides work into sedentary, light, medium,
heavy and very heavy, based on the extent of requirements in the
primary strength activities of sitting, standing, walking,
lifting, carrying, pushing, and pulling." Id. Based on these
factors, the SSA uses the Grids to evaluate whether the claimant
can engage in any other substantial gainful work that exists in
the economy. Id. at 667.
    [7] "An exertional limitation is a limitation or restriction
imposed by impairments and related symptoms, such as pain, that
affect only a claimant's ability to meet the strength demands of
jobs (i.e., sitting, standing, walking, lifting, carrying,
pushing, and pulling)." Rosa v. Callahan, 168 F.3d 72, 78 n.2
(2d Cir. 1999) (citing Zorilla, 915 F. Supp. at 667 n.3).
"'[L]imitations or restrictions which affect [a claimant's]
ability to meet the demands of jobs other than the strength
demands, that is, demands other than sitting, standing, walking,
lifting, carrying, pushing or pulling, are considered non-
exertional.'" Samuels v. Barnhart, 2003 WL 21108321, at *11 n.14
(S.D.N.Y. May 14, 2003) (quoting 20 C.F.R. § 416.969a(a)); see
also 20 C.F.R. § 404.1569a(c).

exclusive reliance on the Grids is inappropriate. See Butts, 388 F.3d at 383 (citing Rosa, 168 F.3d at 78).

## IV.  The ALJ's Decision

On May 2, 2011, ALJ Lebron issued his final decision, finding that during the insured period plaintiff had suffered severe impairments including a small herniated disc at L5-S1, depression, and headaches, but that those impairments did not individually or collectively meet or medically equal any of the per se disability listings found in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15-16). ALJ Lebron found that plaintiff had not engaged in substantial gainful activity between the alleged onset date of his disability, November 15, 2008, through his date last insured, December 31, 2008. (Id. at 15). The ALJ further concluded that, although plaintiff was unable to continue his past work as a carpenter following the onset of his impairments, he had the residual functional capacity during the insured period to perform sedentary work as defined in 20 C.F.R. § 404.1567(a).[8] (Id. at 16-18). The ALJ found that plaintiff

---

[8] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job

qualified as a "younger individual" between the ages of 45 and
49. (Id. at 18). Then, taking into account plaintiff's age,
educational level, work experience, and residual functional
capacity, the ALJ determined that there were jobs in the economy
in significant numbers that the plaintiff could have performed,
in spite of his physical impairments. (Id. at 19). Based on
these findings, the ALJ concluded that plaintiff was not
disabled. (Id.).

With respect to plaintiff's mental health, the ALJ
determined that, although Mr. Grace suffers from depression,
this condition did not significantly limit his ability to work
during the relevant period. (Id.). The ALJ acknowledged Dr.
Grace's undated letter indicating that plaintiff had depressive
symptoms in 2006 and 2007 that were relieved by psychotropic
medications. He also acknowledged Dr. Grace's January 8, 2008
letter, which noted plaintiff's depressed mood, hypersomnia,
anhedonia, and irritability. (Id.). The ALJ similarly noted Dr.
Roithmayr's January 24, 2011 letter diagnosing plaintiff with
major depression, and noting that plaintiff was being treated
with Effexor. (Id.). However, he apparently did not rely on any

---

duties. Jobs are sedentary if walking and standing are required
occasionally and other sedentary criteria are met." 20 C.F.R. §
404.1567(a).

of this evidence in assessing plaintiff's psychological
condition. Instead, he appeared to rely almost entirely on the
normal mental status evaluation indicated in Dr. Feldfogel's
July 10, 2009 report, and, presumably, on the alleged scarcity
of other evidence in the record. (Id.). He indicated that he had
given the opinions of Dr. Roithmayr and Dr. Clark little weight
because they had been based on records of plaintiff's
psychological condition postdating the insured period. (Id.).


The ALJ concluded that "during the period at issue, the
claimant had no restrictions in his activities of daily living
and mild restrictions in his social functioning and
concentration, persistence and pace," noting that "the record
did not document any episodes of decompensation." (Id. at 16).
In making this determination, the ALJ apparently relied in large
part on a self-reporting form that plaintiff had completed for
SSA on July 28, 2009. According to the ALJ, in that form
"claimant stated that he walked his dog daily, was able to take
care of his personal needs, cooked, shopped, and was able to
drive." (Id. at 16, 223-33). Notably, the ALJ made no mention of
those portions of plaintiff's hearing testimony which elaborated
on his earlier written responses and which tended to suggest
that his ability to perform tasks such as cooking, shopping,

driving, and socializing had, in fact, been significantly curtailed as a result of his back pain and depression.

In reference to plaintiff's physical limitations, the ALJ also pointed to a history of treatment with Dr. Feldfogel, whose treatment notes, he concluded, did not document any significant abnormalities -- by which we understand him to mean that there was no objective evidence of physiological abnormalities revealed by medical testing. (Id. at 17). Thus, for example, he pointed to the MRI scan of November 7, 2008, which revealed a small disc herniation at L5-S1, but that noted that there had been no evidence of compression of the thecal sac or the nerve root, and no foraminal or spinal stenosis. (Id.). The ALJ referred to Dr. Feldfogel's July 10, 2009 report, which noted plaintiff's complaints of depression and back pain and showed limited ranges of motion due to muscle spasm and tenderness in plaintiff's lower back. (Id.). The ALJ also referenced Dr. Feldfogel's November 5, 2008 treatment notes, which reported improved back pain resulting from treatment with medication. However, the ALJ made no further mention of Dr. Feldfogel's many treatment notes, which had recorded similar ongoing complaints from plaintiff from 2004 forward. (See id. at 368-92).

The ALJ concluded that, while the medically determinable impairments could reasonably be expected to cause the symptoms of which plaintiff complained, "[plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." (Id.). In support of this determination, the ALJ pointed primarily to plaintiff's written self-report of July 28, 2009, which the ALJ characterized as evidence that plaintiff had maintained essentially normal daily activities. (Id.).

In reaching his decision that plaintiff had the residual functional capacity to perform sedentary work, the ALJ reported giving great weight to the opinion of Dr. Feldfogel and that of Dr. Sekhar, although he did not elaborate as to which portions of their opinions he had relied upon. (Id. at 18). He also noted that, while plaintiff had received treatment from 1995 to 2005 for sinusitis, gastroesophageal disease, and dyspepsia, he found "no evidence of treatment for these conditions during the period at issue and no evidence that these conditions would affect the claimant's ability to work." (Id.).

The ALJ concluded that plaintiff could not perform his previous work as a carpenter. (Id. at 19). Nonetheless, he found

that, given "the findings concerning the claimant's age, education, relevant work experience, and residual functioning capacity," the framework set forth in Rule 201.21, Table No. 1 Subpart P, Regulations No. 4 indicated that there were a significant number of jobs in the regional economy that plaintiff could perform.[9] (Id. at 19). The ALJ indicated that "[u]sing this rule as a framework for decision-making," he had determined that there were a significant number of jobs in the regional economy that the claimant can perform. (Id.). He gave no further indication of how, exactly, he had applied the Grids in reaching his decision.

Ultimately, he concluded that "based on the application for a period of disability and disability insurance benefits filed on June 18, 2009, the claimant was not disabled." (Id. at 20). This unfavorable decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for further review. (Id. at 1); see 20 C.F.R. §§ 404.955.

_____

[9] This regulation refers to individuals who are between the ages of 45 and 49, have a high school education or higher, and have non-transferrable skills.

## V.   __This Case__

On December 5, 2011, plaintiff filed the present action seeking review of the SSA's decision. He argues that the Commissioner's findings are not supported by substantial evidence and are contrary to the law. (Compl. ¶ 5). The parties have cross-moved for judgment on the pleadings.

## ANALYSIS

## I.   __Standard of Review__

When a claimant challenges the Social Security Administration's denial of disability benefits, a court may set aside the Commissioner's decision only if it is not supported by substantial evidence or was based on legal error. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam))); see 42 U.S.C. § 405(g) (stating that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").

"Substantial evidence" is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004). The substantial-evidence test applies not only to the Commissioner's factual findings, but also to inferences drawn from the facts. E.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999). In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because analyzing the substantiality of the evidence must also include that which detracts from its weight. See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)); Williams ex rel. Williams, 859 F.2d at 258.

The Commissioner, not the court, must resolve evidentiary conflicts and appraise the credibility of witnesses, including the claimant. See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Carroll, 705 F.2d at 642. While the ALJ need not resolve

32

every conflict in the record, Miles v. Harris, 645 F.2d 122, 124
(2d Cir. 1981), "the crucial factors in any determination must
be set forth with sufficient specificity to enable [a reviewing
court] to decide whether the determination is supported by
substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587
(2d Cir. 1984); cf. Snell v. Apfel, 177 F.3d 128, 134 (2d Cir.
1999) (holding that claimant was entitled to an explanation of
why the Commissioner discredited her treating physician's
disability opinion).

In addition to the consideration of the evidence in the
record, a reviewing court must consider the ALJ's application of
the law to the record before him. Correale-Englehart v. Astrue,
687 F. Supp. 2d 396, 422 (S.D.N.Y. 2010). The court "reviews de
novo whether the correct legal principles were applied and
whether the legal conclusions made by the [SSA] were based on
those principles." Thomas v. Astrue, 674 F. Supp. 2d 507, 520
(S.D.N.Y. 2009).

Since disability benefits proceedings are non-adversarial
in nature, the ALJ has an affirmative obligation to fully
develop the administrative record, even when the claimant is
represented by counsel. See Lamay v. Comm'r of Soc. Sec., 562

33

F.3d 503, 508-09 (2d Cir. 2009); Casino-Ortiz v. Astrue, 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing Perez, 77 F.3d at 47). To this end, the ALJ must make "every reasonable effort" to help an applicant get medical reports from his medical sources. 20 C.F.R. §§ 404.1512(d), 416.912(d). Ultimately, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity." Casino-Ortiz, 2007 WL 2745704, at *7 (citing 20 C.F.R. § 404.1513(e)(1)-(3)). The ALJ must therefore seek additional evidence or clarification when the "report from [claimant's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1).

The ALJ must also adequately explain his reasoning in making the findings on which his ultimate decision rests, and in doing so, he must address all pertinent evidence. See, e.g., Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Ferraris, 728 F.2d at 586-87; see also Allen ex rel. Allen v. Barnhart, 2006 WL 2255113, at *10 (S.D.N.Y. Aug. 4, 2006) (finding that the ALJ explained his findings with "sufficient specificity" and cited

34

specific reasons for his decision). An ALJ's "'failure to acknowledge relevant evidence or to explain its implicit rejection is plain error.'" Kuleszo v. Barnhart, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (quoting Pagan v. Chater, 923 F. Supp. 547, 556 (S.D.N.Y. 1996)).

The Social Security Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings. As expressly stated: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); Butts, 388 F.3d at 382. If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the court will remand the case for further development of the evidence or for more specific findings. Rosa, 168 F.3d at 82-83 (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)). Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39. If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate. See, e.g., Butts,

35

388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117 (2d Cir. 2000)).

## II.  **Plaintiff's Arguments**

Plaintiff argues, first, that the ALJ failed to afford the proper weight to the medical opinions of plaintiff's doctors under the treating physician rule. (Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl.'s Mot.") 15). In particular, he argues that Dr. Roithmayr's opinion should have been considered a retrospective diagnosis by a treating physician. (Id. at 16). He also argues that the ALJ improperly disregarded the testimony of the vocational expert, Ms. Green, and that of the psychiatric consultant, Dr. Clark. (Id. at 15-16).

Plaintiff further argues that the ALJ should have deemed him to be an individual "closely approaching advanced age" on the date that the decision was rendered (id. at 15) -- that is, as falling into the category of applicants between the ages of 50 and 54, for whom "age along with a severe impairment(s) and limited work experience may seriously affect [their] ability to adjust to other work." 20 C.F.R. § 404.1563(e). Plaintiff also

36

argues that, in light of his non-exertional limitations, the ALJ improperly relied on the Grids and that, consequently, the ALJ did not accurately determine plaintiff's residual functional capacity. (Mem. of Law in Opp'n to Def.'s Mot. for J. on the Pleadings and in Further Supp. of Pl.'s Mot. For J. on the Pleadings ("Pl.'s Mem. in Opp'n to Def.'s Mot.") 10-11). Plaintiff seeks an order reversing the Commissioner's determination and granting him disability insurance benefits from November 15, 2008 onward.

We assess the record and conclude that the ALJ's decision suffers from a number of defects that justify a remand for further development of the record and additional findings.

III. **Assessment of the Record**

Plaintiff's claim for benefits is premised on the alleged cumulative effect of both physical problems -- notably chronic lower back pain -- and depression that even the SSA's consulting psychiatrist acknowledged to be serious. Complicating the analysis is the fact that plaintiff's insurance coverage expired at the end of 2008, necessitating an assessment of plaintiff's disability as of that time. In light of the sketchy nature of

the current record concerning plaintiff's condition during the relevant period, we find the record to be manifestly inadequate in the absence of any evident effort by the ALJ to seek supplemental clarifying information from plaintiff's doctors on this key issue. As we also discuss below, the ALJ's analysis is otherwise flawed in a number of respects, all of which compel a remand for further SSA consideration.

A. The ALJ Failed to Obtain Clarifying Information from Dr. Feldfogel Concerning the Severity of Plaintiff's Psychological Condition During the Insured Period

As an initial matter, we observe that there is a significant gap in the record concerning the nature and severity of plaintiff's depression during the period when he was insured. Dr. Feldfogel's treatment notes indicate that plaintiff was diagnosed with depression starting in 2004 (Tr. at 392), for which Dr. Feldfogel treated him through November 2009. Thus, Dr. Feldfogel's records show that plaintiff was treated for depression and was prescribed anti-depressant medication, including Effexor and Lexapro, prior to plaintiff's last insured date. (Tr. 368-79).

38

The ALJ stated that he had afforded "great weight" to Dr. Feldfogel's treatment records, but he failed to identify which aspects of the doctor's records were given such weight, whether the weight was controlling and, if not, the degree of credit that the ALJ granted them.

The Commissioner maintains that, although Dr. Feldfogel's medical records were complete, they "simply did not contain any mental status findings concerning depression." (Def.'s Mot. 16). In particular, defendant argues that Dr. Feldfogel's treatment notes "did not document any significant abnormalities." (Tr. 17). This is plainly incorrect.

In reaching his conclusion about plaintiff's psychological condition, the ALJ apparently placed special emphasis on the "normal" mental status evaluation in Dr. Feldfogel's July 10, 2009 report. (Id.). However, without explanation, he appears to have essentially ignored Dr. Feldfogel's treatment records documenting plaintiff's depression from as early as 2004 -- a diagnosis that reflects plaintiff's apparently abnormal psychological condition.

39

In addition, as noted above, Dr. Feldfogel's treatment file included a letter from plaintiff's brother, psychologist Dr. John Grace, dated January 8, 2008. In that letter, Dr. Grace diagnosed plaintiff as having "Major Depressive Disorder," noting "prominent symptoms of depressed mood every day, hypersomnia, loss of interest, irritability and anxiety and diminished ability to perform daily activities" and recommended that plaintiff be switched from Lexapro to Cymbalta to treat his depression. (Id. at 287). The ALJ and the SSA's medical consultants did not address this piece of evidence, which was apparently provided to Dr. Feldfogel to assist his treatment of plaintiff's depression during the relevant period (see id. at 28), and which provides a more detailed description of plaintiff's symptoms than is reflected in Dr. Feldfogel's contemporaneous treatment notes. Thus, defendant's representation that Dr. Feldfogel's records did not contain mental status findings is not entirely accurate, and to the extent that the ALJ concluded that Dr. Grace's January 2008 letter should, for whatever reason, be disregarded, he should have at least provided an explanation of his reasoning. See Kuleszo, 232 F. Supp. 2d at 57.

40

We also note that SSA regulations provide that "[w]hen the evidence from [a claimant's] treating physician is inadequate for [the ALJ] to determine whether [the claimant] is disabled… [the ALJ] will first recontact [claimant's] treating physician… to determine whether the additional information… is readily available." 20 C.F.R. § 404.1512(e). In this case, however, there is nothing in the record to suggest that the ALJ took any steps to obtain additional clarifying information from Dr. Feldfogel or Dr. Grace concerning plaintiff's psychological condition during the insured period. For this reason, we conclude that the ALJ failed to fully develop plaintiff's medical records on his psychiatric status, thus warranting remand. See Rosa, 168 F.3d at 79 (sparse notes, incomplete record of medical visits, and brief, conclusory assessments constitute gap in the medical record requiring ALJ development sua sponte); Schaal v. Apfel, 134 F.3d 496, 505 (2d. Cir. 1998) ("If the clinical findings were inadequate, it was the ALJ's duty to seek additional information from the treating physician sua sponte."); Pino v. Astrue, 2010 WL 5904110, at *21 (S.D.N.Y. Feb. 8, 2010); Eltayyeb v. Barnhart, 2003 WL 22888801, at *7 (S.D.N.Y. Dec. 8, 2003).

41

B. The ALJ Misapplied the Treating Physician Rule to the
   Opinions of Dr. Grace, Dr. Roithmayr, and Dr. Rosenblatt

     The treating-physician rule "requires an ALJ to grant
special deference to the opinions of a claimant's treating
physician." Acosta v. Barnhart, 2003 WL 1877228, at *10
(S.D.N.Y. Apr. 10, 2003); see also Kamerling v. Massanari 295
F.3d 206, 209 n.9 (2d Cir. 2002); Clark, 143 F.3d at 118. "A
'treating source' is defined as a claimant's 'own physician,
psychologist, or other acceptable medical source who provides
[claimant], or has provided [claimant], with medical treatment
or evaluation, and who has, or has had, an ongoing treatment
relationship with [claimant].'" Martinez v. Astrue, 2009 WL
2168732, at *12 n.26 (S.D.N.Y. July 16, 2009) (brackets in
original) (citing 20 C.F.R. §§ 404.1502, 416.902). "The
Commissioner 'may consider an acceptable medical source who has
treated or evaluated [claimant] only a few times or only after
long intervals (e.g., twice a year) to be [claimant's] treating
source if the nature and frequency of the treatment or
evaluation is typical for [claimant's] condition(s).'" Id.

     SSA regulations require that the findings of a claimant's
treating physician be afforded controlling weight over those of

42

a non-treating physician -- and in particular, a non-examining physician -- when the treating physician's opinion is consistent with substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); see also Schisler v. Sullivan, 3 F.3d 563, 566 (2d Cir. 1993). However, "if a treating physician's opinion is either not well supported by medically acceptable clinical and laboratory diagnostic techniques or inconsistent with other substantial evidence in the record, it need not be afforded controlling weight." Valerio v. Comm'r of Soc. Sec., 2009 WL 2424211, at *11 (E.D.N.Y. Aug. 6, 2009) (quoting Perez, 77 F.3d at 48).

If the treating physician's opinion is inconsistent with other substantial evidence in the record, the ALJ must then consider four factors when determining the appropriate weight to give that opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." Hartnett v. Apfel, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998); accord Halloran, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). An ALJ must not substitute his "own assessment of the relative merits of the objective

43

evidence and subjective complaints for that of a treating physician." Garcia v. Barnhart, 2003 WL 68040, at *7 (S.D.N.Y. Jan. 7, 2003).

### a. Dr. Grace

Dr. Grace did not directly treat his brother's depression; however, from about 2007 onward, he did informally monitor plaintiff's psychological condition and offered consultative recommendations on treatments that plaintiff might pursue through his primary care physician, Dr. Feldfogel. As a psychologist who evaluated plaintiff's psychological condition on an ongoing basis, Dr. Grace would appear to qualify as a "treating source" pursuant to 20 C.F.R. §§ 404.1502, 416.902, thereby entitling his opinion to substantial weight. However, even if Dr. Grace were deemed only to be a non-treating source - - that is, one who "examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant], 20 C.F.R. §§ 404.1502 -- his opinion and findings were entitled to far greater weight than the ALJ afforded them.[10]

[10] Even if Dr. Grace was not professionally qualified as an acceptable medical source, his non-medical observations would have been entitled some weight as "other source[]" evidence from a sibling. 20 C.F.R. § 404.1513(d)(4). While an "other source" opinion is not granted the same level of deference as the

Indeed, without explanation, the ALJ essentially ignored Dr. Grace's reported findings in making his determination concerning plaintiff's psychological condition during the insured period. This was impermissible.

As an aside, we note that while Dr. Grace's relation to plaintiff might suggest the potential for bias in favor of plaintiff, his January 2008 letter to Dr. Feldfogel predates the alleged onset of plaintiff's disability, thereby lending a degree of credibility to the accuracy of his diagnoses at the time the letter was written. Thus, to the extent that the ALJ deemed Dr. Grace's diagnosis to be incredible, for whatever reason, he was required to explain his rationale for reaching such a conclusion.

b. Dr. Roithmayr

Plaintiff argues that the ALJ improperly disregarded Dr. Roithmayr's medical report of January 24, 2011, which asserts that plaintiff has been disabled, unable to work, and has suffered from major depression since at least November 2008.

---

opinion of a treating physician, his or her assessment is afforded some weight. See Sweat v. Astrue, 2011 WL 2532932, at *9 (N.D.N.Y. May 23, 2011).

(Pl.'s Mem. in Opp'n to Def.'s Mot. 13). Plaintiff asserts that this report is a retrospective diagnosis and should have been given "extra weight" under the treating physician rule. (Pl.'s Mot. 17). Defendant on the other hand, claims that because Dr. Roithmayr's conclusions were made after the date when plaintiff was last insured and "did not address [plaintiff's] mental functioning during the crucial period," his opinions should be dismissed. (Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def.'s Mot.") 16). This is indefensible.

The courts have held that the treating-physician rule applies to retrospective diagnoses. See Shaw, 221 F.3d at 133; Perez, 77 F.3d at 48; Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 861-62 (2d Cir. 1990). The retrospective opinion of a doctor who is currently treating a claimant is "entitled to significant weight" even though the doctor did not treat the claimant during the relevant period. Campbell v. Barnhart, 178 F. Supp. 2d 123, 134-35 (D.Conn. 2001) (quoting Dousewicz v. Harris, 646 F.2d 771, 774 (2d Cir. 1981)). "[S]uch a diagnosis must be evaluated in terms of whether it is predicated upon medically accepted clinical diagnostic techniques and whether considered in light of the entire record, it establishes the existence of a[n]… impairment" before the requisite onset date.

46

Dousewicz, 646 F.2d at 775. In Rivera v. Sullivan, 923 F.2d 964 (2d Cir. 1991). Moreover, the Second Circuit has held that a retrospective medical diagnosis by a subsequent treating physician is entitled to controlling weight when "no medical opinion in evidence contradict[s] [a] doctor's retrospective diagnosis finding a disability." Rivera, 923 F.2d at 968; see Gercke v. Chater, 907 F. Supp. 51, 52 (E.D.N.Y. 1995) (holding that, "[e]ven if the treating physician's opinion is retrospective, the opinion is binding on the ALJ unless contradicted by other medical evidence or overwhelmingly compelling non-medical evidence"). Even if the evidence submitted is insufficient for the ALJ to form a conclusion as to the reliability of the retrospective diagnosis, the ALJ is obligated to supplement the record with clarifying evidence rather than simply rejecting the diagnosis. Martinez v. Massanari, 242 F. Supp. 2d 372, 378 (S.D.N.Y. 2003); see 20 C.F.R. §§ 404.1512(e)(1) & (f); Schaal, 134 F.3d at 505; Perez, 77 F.3d at 47.

Aside from citing the fact that Dr. Roithmayr did not begin treating plaintiff until after the end of the insured period, the ALJ provided no basis for rejecting his medical opinion about plaintiff's psychological condition prior to July 2010.

47

(Tr. 17). Without more, this does not provide a basis for disregarding the doctor's opinion. See Pollard v. Halter, 377 F.3d 183, 194 (2d Cir. 2004) (finding that the "district court erred insofar as it categorically refused to consider the new evidence simply because it was generated after the relevant time period and did not 'explicitly discuss [claimant's] condition during the relevant time period'").

If the ALJ considered Dr. Roithmayr's retrospective comments descriptive only, see Peterson v. Barnhard, 219 F. Supp. 2d 491, 496-97 (S.D.N.Y. 2002) (concluding that the retrospective analysis at issue could not be afforded great weight because the doctor merely described plaintiff's condition after the disputed period and failed to support his conclusions), or otherwise found the opinion to be contradicted by substantial evidence in the record, he was obligated to adequately explain his reasons for reaching such a conclusion. This he failed to do. In addition, to the extent that the ALJ may have concluded that Dr. Roithmayr's January 2011 report did not constitute a retrospective diagnosis, he was obligated to take steps to obtain a retrospective medical opinion from Dr. Roithmayr. See Pino, 2010 WL 5904110, at *20.

48

### c. Dr. Rosenblatt

Dr. Rosenblatt has provided pain management treatment to plaintiff "on a regular basis" (Tr. 41); however, like Dr. Roithmayr, Dr. Rosenblatt only began treating plaintiff after his last date insured. Nonetheless, as a treating physician and, particularly as one specialized in treating one of the main conditions on which plaintiff premises his disability claim, Dr. Rosenblatt's treatment records and medical opinion undoubtedly should have been considered by the ALJ. They apparently were not. In the absence of any indication that the ALJ took steps to obtain Dr. Rosenblatt's treatment records or his retrospective medical opinion about plaintiff's condition, we consider the record to be incomplete. See Pino, 2010 WL 5904110, at *20.

### C. The ALJ's Conclusion as to the Impact of Plaintiff's Depression Was Not Supported by Substantial Evidence

Although the ALJ acknowledged that plaintiff suffers from depression, he concluded that "this condition does not significantly limit his ability to work." The ALJ explicitly stated that, in reaching his conclusion, he afforded little weight to the opinions of Dr. Roithmayr, plaintiff's treating

psychologist, and of Dr. Clark, SSA's consultant psychiatrist. (Tr. 17). He also implicitly ignored the evidence provided by plaintiff's brother, Dr. Grace, as well as Dr. Feldfogel's five years of treatment notes which document diagnosis and treatment of plaintiff for depression. His conclusion, thus, appears to have hinged on a singular report in July 2009 by Dr. Feldfogel, which the ALJ characterized as a normal mental status evaluation. (Id.). We note, however, that even that report reiterated Dr. Feldfogel's prior diagnosis that plaintiff suffers from depression. (Id. at 271). The ALJ's selective reliance on Dr. Feldfogel's July 2009 report is particularly problematic given that it postdates the insured period and is not consistent with other evidence from during the insured period, including Dr. Feldfogel's own earlier treatment notes and Dr. Grace's 2008 letter. In sum, we conclude that the ALJ's findings concerning plaintiff's psychological condition was not supported by substantial evidence in the record.

D. The ALJ Afforded Undue Weight to Dr. Sekhar's Opinion

We observe that neither of SSA's consulting doctors, Dr. Clark or Dr. Sekhar, actually examined plaintiff. Instead, their opinions appear to have been rendered based solely on the

treatment records of Dr. Feldfogel and Dr. Roithmayr, and on the testimony of plaintiff during the hearing -- although, in this regard, we note that Dr. Sekhar was apparently unable to accurately hear over the phone much of what was said at the hearing. (See Tr. 65-74).

According to the Second Circuit, the opinions of such non-examining doctors do not amount to substantial evidence. See Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003). We also note that beyond merely parroting Dr. Feldfogel's July 10, 2009 report findings as to plaintiff's exertional capacity, Dr. Sekhar's testimony bordered on the incoherent.[11] What is more,

---

[11] Consider, for example, the following colloquy between the plaintiff's counsel and Dr. Sekhar (Tr. 70-71):
    Q: Are you taking into consideration that the claimant takes medication to control his pain for the back?
    A: Medication?
    Q: Are you taking into consideration the fact that the claimant takes medication for his back pain?
    A: That is a question that does not have a clear answer. According at some time he said but according to Dr. Roithmeyr's report, 13F, I am informed he was on Lexapro, and Effexor.
    Q: How does that affect his ability to function doctor, the medication that you just stated?
    ALJ: Did you hear the question, doctor?
    A: No.
    Attorney: How does the medication affect the claimant's ability to function; the lifting, the carrying, the standing, the walking?
    A: The medications Effexor and Venlafaxine? How does it affect him?
    Q: Yes, how does it affect him?
    A: Well, the medication for his depression?

Dr. Sekhar's apparent lack of familiarity with plaintiff's prescriptions, other than those listed in Dr. Roithmayr's psychiatric report, or with plaintiff's longstanding symptomology, as reflected throughout Dr. Feldfogel's treatment notes, draws into question whether she had actually reviewed those notes in their entirety.

It certainly was error for the ALJ to have given greater weight to Dr. Sekhar's repetition of the findings noted in Dr. Feldfogel's July 10, 2009 report than he gave to the actual findings reported in Dr. Feldfogel's years' worth of treatment notes that predated that report. See Gonzalez v. Apfel, 113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000) (ALJ erred in giving greater weight to evidence presented by non-examining medical consultant than to the evidence of the treating physician); cf. Hidalgo v. Bowen, 822 F.2d 294, 297 (2d Cir. 1987) ("the opinion of a non-examining doctor by itself cannot constitute the contrary

---

Q: Yes, doctor.
A: Well, as I said, he could only lift as much as I mentioned. In fact, it could be better [inaudible].
Q: Would the fact that the claimant only sleeps an hour and a half to two hours a night affect his ability to concentrate and doing lifting and carrying and walking?
A: Well again, [inaudible] the treating doctor but as far as the [inaudible] there is nothing to tell me that he is in the daytime affected by the sleeplessness.
Q: You don't have sufficient information, is that what you're saying to make a decision on that?
A: What occupation?

substantial evidence required to override the treating physician's diagnosis"). In sum, we conclude that the ALJ had little basis for relying on the opinion of Dr. Sekhar, in light of substantial evidence in the record.

### E. The ALJ Erred in his Analysis of Plaintiff's Residual Functional Capacity

In assessing an applicant's residual functional capacity ("RFC"),[12] the ALJ must consider a claimant's "physical abilities, mental abilities, symptomatology, including pain and other limitations that could interfere with work activities on a regular and continuing basis." 20 C.F.R. § 404.1545(a). A regular and continuing basis is defined as "8 hours a day, for five days a week, or an equivalent work schedule." SSR 96-8p.

We note that, in addition to plaintiff's back and shoulder pain and depression, he also described chronic headaches, anxiety, and sleeplessness that collectively gave rise to a constant feeling of tiredness and fogginess. (Id. at 35-37, 51). Although the ALJ in this case did make passing reference to each

---

[12]   An individual's residual functional capacity refers to the greatest amount of functional activity that the claimant can still engage in, despite his or her physical or psychological limitations. 20 C.F.R. § 404.1545(a)(1).

of plaintiff's physical and non-physical impairments (see Tr. 16-18), he did not provide any meaningful discussion of the potential combined effects that these impairments might have on plaintiff's ability to work. This was error. 20 C.F.R. § 404.1523; see Dixon v. Shalala, 54 F.3d 1019, 1031 (2d Cir. 1995) ("the combined effect of a claimant's impairments must be considered in determining disability; the SSA must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe."). Upon remand, the ALJ must give more explicit consideration to the combined impact that these conditions may have had upon the plaintiff's ability to work during the relevant period.

We also note that ALJ Lebron did not consider the effects of plaintiff's medications on his residual functional capacity. Pursuant to 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(g), the ALJ

> must give attention to the effects of medication on [a claimant's] symptoms, signs, and ability to function. While drugs used to modify psychological functions and mental states may control certain primary manifestations of a mental disorder, e.g., hallucinations, impaired attention, restlessness, or hyperactivity, such treatment may not affect all functional limitations imposed by the mental disorder. In cases where overt symptomatology is

54

> attenuated by the use of such drugs, particular attention must be focused on the functional limitations that may persist…
>
> Drugs used in the treatment of some mental illnesses may cause drowsiness, blunted [a]ffect, or other side effects involving other body systems. We will consider such side effects when we evaluate the overall severity of [a claimant's] impairment.

As of the date of plaintiff's disability insurance application, he was taking, among other medications, Venlafaxine, Avelox, Ventolin, and Nexium and using Lidoderm patches for pain. Nonetheless, the ALJ apparently did not consider the potential limiting effects of plaintiff's medications on his ability to do work.[13] On remand, the ALJ

---

[13] For example, for Venlafaxine, such side effects may include drowsiness, dizziness, weakness, feeling nervous, increased sweating, blurred vision, dry mouth, changes in appetite or weight, mild nausea, constipation, decreased sex drive, and impotence. See "Venlafaxine Side Effects," Drugs.com, http://www.drugs.com/sfx/venlafaxine-side-effects.html (last visited May 21, 2013). The side effects for Avelox may include nausea, mild diarrhea, headache, dizziness, blurred vision, feeling nervous, anxious, or agitated, and mild skin itching, and the side effects for Ventolin may include dizziness, spinning sensation, headache, insomnia, muscle cramps, dry mouth and throat, and nausea. See "Avelox Side Effects," Drugs.com, http://www.drugs.com/sfx/avelox-side-effects.html (last visited May 21, 2013); "Ventolin Side Effects," Drugs.com, http://www.drugs.com/sfx/ventolin-side-effects.html (last visited May 21, 2013). For Nexium, side effects may include headache, drowsiness, mild diarrhea, nausea, stomach pain, gas, and constipation. See "Nexium Side Effects," Drugs.com, http://www.drugs.com/search.php?searchterm=Nexium (last visited May 21, 2013).

should discuss whether the side effects of plaintiff's medications limited plaintiff's residual functional capacity.

F. The ALJ Failed to Adequately Explain his Assessment of Plaintiff's Credibility

The ALJ exercises discretion over the weight assigned to a claimant's testimony regarding the severity of his pain and other subjectively perceived conditions and his resulting limitations. See, e.g., Schultz, 2008 WL 728925 at *12 (citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); Snell, 177 F.3d at 135). Where the ALJ's findings are supported by substantial evidence, a reviewing court must uphold the ALJ's decision to discount plaintiff's testimony. See Marcus, 615 F.2d at 27 (citing Richardson, 402 U.S. at 401).

Nonetheless, the ALJ's discretion is not unbounded. The Second Circuit has held that throughout the five-step process, "'the subjective element of [plaintiff's] pain is an important factor to be considered in determining disability.'" Perez v. Barnhart, 234 F. Supp. 2d 336, 340 (S.D.N.Y. 2002) (quoting Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984)); see also 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) ("We will... consider

56

descriptions and observations of [a claimant's] limitations from [his or her] impairment(s), including limitations that result from [his or her] symptoms, such as pain, provided by [the claimant]"). In assessing the claimant's testimony, the ALJ must take all pertinent evidence into consideration. E.g., Perez, 234 F. Supp. 2d at 340-41; see also Snell, 177 F.3d at 135 (stating that an ALJ is in a better position to decide credibility than the Commissioner). Even if a claimant's account of subjective pain is unaccompanied by positive clinical findings or other objective medical evidence, it may still serve as the basis for establishing disability as long as the impairment has a medically ascertainable source. See, e.g., Harris v. R.R. Ret. Bd., 948 F.2d 123 (2d Cir. 1991) (citing Gallagher v. Schweiker, 697 F.2d 82, 84-85 (2d Cir. 1983)).

As ALJ Labron correctly noted, SSA regulations outline a two-step framework under which an ALJ must evaluate a claimant's subjective description of his or her impairment and related symptoms. 20 C.F.R. §§ 404.1529, 416.929; see also SSR 96-7p, 1996 WL 374186, at *6-9 (July 2, 1996) (summarizing framework). "First, the ALJ must consider whether the claimant has a medically determinable impairment which could reasonably be expected to produce the... symptoms alleged by the claimant."

57

Martinez, 2009 WL 2168732, at *16 (alteration in original) (citing McCarthy v. Astrue, 2007 WL 4444976, at *8 (S.D.N.Y. Dec. 18, 2007)); see also 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). "Second, the ALJ must 'evaluate the intensity and persistence of those symptoms considering all of the available evidence.'" Peck v. Astrue, 2010 WL 3125950, at *4 (E.D.N.Y. Aug. 6, 2010) (citing 20 C.F.R. § 404.1529(c)); accord Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)) & Taylor v. Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003)). "To the extent that the claimant's 'pain contentions are not substantiated by the objective medical evidence,' the ALJ must evaluate the claimant's credibility." Peck, 2010 WL 3125950, at *4 (citing 20 C.F.R. § 404.1529(c)); see also Meadors, 370 F. App'x at 183-84 (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii); Taylor, 83 F. App'x at 350-51).

It should be noted that "the second stage of [the] analysis may itself involve two parts." Sanchez v. Astrue, 2010 WL 101501, at *14 (S.D.N.Y. Jan. 12, 2010). "First, the ALJ must decide whether objective evidence, on its own, substantiates the extent of the alleged symptoms (as opposed to the question in the first step of whether objective evidence establishes a

58

condition that could 'reasonably be expected' to produce such symptoms)." Id. "Second, if it does not, the ALJ must gauge a claimant's credibility regarding the alleged symptoms by reference to the seven factors listed [in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3)]." Id. (citing Gittens v. Astrue, 2008 WL 2787723, at *5 (S.D.N.Y. June 23, 2008)). These factors include: (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); see also Bush, 94 F.3d at 46 n.4; Wright v. Astrue, 2008 WL 620733, at *3 (E.D.N.Y. Mar. 5, 2008) (citing SSR 96-7p). If the ALJ does not follow these steps, remand is appropriate. Sanchez, 2010 WL 101501, at *15 (citing 20 C.F.R. § 404.1529(c)).

59

Importantly, "'[o]nly allegations beyond what is substantiated by medical evidence are to be subjected to a credibility analysis... [because requiring] plaintiff to fully substantiate [his] symptoms with medical evidence would be both in abrogation of the regulations and against their stated purpose." Martin v. Astrue, 2009 WL 2356118, at *10 (S.D.N.Y. July 30, 2009) (citing Castillo v. Apfel, 1999 WL 147748, at *7 (S.D.N.Y. Mar. 18, 1999)).

In this case plaintiff testified to continual debilitating lower-back pain, headaches, and depression. These complaints were consistently documented in Dr. Feldfogel's treatment notes from 2004 through 2009, and in Dr. Feldfgoel's July 10, 2009 report, which noted some limitations in plaintiff's ability to stand, lift, climb, crouch, squat, and bend. (Id. at 272).

However, the ALJ asserted that, in the purported absence of objective medical evidence of significant physical abnormalities, plaintiff's statements concerning the intensity, persistence and limiting effects of his pain were not credible. (Tr. at 18). He observed that plaintiff had reported "essentially normal daily activities" such as walking his dog, taking care of his personal needs, cooking, shopping, and

driving. (Id.). In fact, we note, plaintiff had reported significant limitations in these tasks, noting that his wife performed all of the housework and that he was unable to cook or clean, that he was only able to accompany his wife to the store and was unable to lift shopping bags of more than five pounds, that he could walk for only about fifteen minutes at a time, and that he was unable to sit comfortably while driving for any longer than about one half hour. (Id. at 44-51; see also id. 211-22).

The ALJ failed to address other pertinent criteria relevant to plaintiff's claims of pain, including the location, duration, frequency, and intensity of plaintiff's pain; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of the medications that plaintiff was taking to alleviate pain; treatments other than medication that plaintiff had attempted -- including physical therapy -- for relief of pain; and any other factors concerning his functional limitations and restrictions. In particular, he failed to address plaintiff's reliance on Lidoderm patches, physical therapy, and various muscle relaxants to cope with the pain, as well as his apparent inability to sleep as a result of his symptoms.

61

Because the ALJ failed to meaningfully address these criteria, his analysis of plaintiff's credibility was inadequate under the governing regulations.

G. The ALJ Failed to Carry SSA's Burden of Proof in Assessing the Availability of Jobs in the Economy

In his decision, the ALJ did not discuss, and apparently did not give any consideration to, the testimony of the independent vocational expert concerning the availability of jobs for persons in plaintiff's position.

We note that, while an ALJ is not obligated to "reconcile explicitly every conflicting shred of medical testimony," Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983); Miles, 645 F.2d at 124, he cannot simply selectively choose evidence in the record that supports his conclusions. Fiorello, 725 F.2d at 176; Andino v. Bowen, 665 F. Supp. 186, 190 (S.D.N.Y. 1987). Here the plaintiff was entitled to know why the ALJ disregarded the testimony of the vocational expert, which was seemingly beneficial to his application for benefits. See Dioguardi v. Comm'r of Soc. Sec., 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006) (citing Gecevic v. Sec'y of Health & Human Servs., 882 F. Supp. 278, 285–86 (E.D.N.Y. 1995)). By failing to do so, the ALJ

failed to carry SSA's burden of proof at the fifth stage of the
disability analysis.


H. ALJ Lebron Should Have Addressed the Impact of Plaintiff's
   Depression on the Applicability of the Grids


As noted above, the ALJ's assessment of plaintiff's
depression was deficient in several ways. Those errors, in turn,
may have infected the ALJ's analysis concerning the availability
of jobs for persons in plaintiff's condition. In assessing a
claimant's ability to engage in substantial gainful work in the
national economy, an ALJ may rely primarily on the Grids to
assess disability where the claimants impairments are solely
exertional. Rosa, 168 F.3d at 78. However, "sole reliance on the
[Grids] may be precluded where the claimant's exertional
impairments are compounded by significant non-exertional
impairments that limit the range of sedentary work that the
claimant can perform." 20 C.F.R. Pt. 404, Subpart P, App. 2, §§
200.00(e)(2), 201.00(h).


Here, the ALJ did not clearly specify the manner in which
he applied the Grids -- that is, he failed to specify whether he
considered them to be dispositive or instead relied on them
simply as a guide to his analysis. (See Tr. 19). Thus, on

remand, once the ALJ has determined whether plaintiff's depression constitutes a non-exertional impairment, he must address whether any such "nonexertional impairment so significantly diminished [plaintiff's] work capacity that the grids would not apply in his case." See Batista v. Charter, 972 F. Supp. 211, 220 (S.D.N.Y. 1997). In making that assessment, the ALJ should more clearly specify the basis for his reasoning and, to the extent that he chooses to rely on the Grids, he must state how it is that he has applied them in making his determination.

I. The ALJ Should Have Considered Plaintiff's Eligibility for Benefits as an "Individual Approaching Advanced Age"

When performing an analysis using the Grids, the ALJ must differentiate between "younger individuals" -- those between the ages of 18 and 49 -- and "individuals approaching advanced age" -- those between the ages of 50 and 54. 20 C.F.R. Part 404, Subpart P., Appx.2, Rule 201.00(g) and (h).

Mr. Grace was 49 years old on the date last insured, and ALJ Lebron accordingly classified him as a younger individual. (Tr. 19). Plaintiff argues that using this age classification was improper because he was 52 years old -- an individual

64

closely approaching advanced age -- when the hearing began. (Pl.'s Mot. 16).

Though plaintiff has argued that his age at the time of the hearing is controlling, we reject this contention. According to Social Security Ruling 83-10, "the oldest age to be considered is the [claimant's] age at the date last insured... the person's age at the time of decision making is immaterial." SSR 83-10; 20 C.F.R. § 404.1563(b).

Nonetheless, Mr. Grace turned 50 years old -- an age deemed "approaching advanced age," 20 C.F.R. § 404.1563(d) -- a mere fifteen days after the last date on which he was insured. As such, we address sua sponte whether plaintiff is a "borderline" case for purposes of applying the Grids.

As provided by the Regulations, the Commissioner will not mechanically apply the age categories in borderline cases where the claimant is within a few days to a few months of reaching an older age category. 20 C.F.R. § 404.1563(b). In this situation, an ALJ can use an older age category after evaluating the overall impact of all the factors in the case. Id. Moreover, "case law focusing on this issue is decisive.

65

Mechanical application of the age criteria... is not appropriate in borderline cases." Hill v. Sullivan, 769 F. Supp. 467, 470 (W.D.N.Y. 1991).

We note that the distinction between being classified as a "younger person" and being classified as a "person closely approaching advanced age" can be dispositive in determining whether an individual qualifies as disabled. See 20 C.F.R. § 404.1563, 20 C.F.R. § 404 App. 2., Rules 201.09, 201.10; see also Stafford v. Astrue, 581 F. Supp. 2d 456 (W.D.N.Y 2008) (plaintiff was two-and-a-half months away from her fiftieth birthday on the date last insured).

Medical-Vocational Rule 201.14 directs a finding of disability for a claimant who meets the following criteria: (1) the individual is closely approaching advanced age; (2) the individual is limited to sedentary work; (3) the individual has no transferable skills from previous work; and (4) the individual's education did not provide for direct entry into skilled work. 20 C.F.R. Part 404 Subpart P Appx. 2 §§ 201.9, 201.10, 201.12, 201.14. A claimant is not disabled under these circumstances if the individual has recently completed education which provides a basis for direct entry into skilled sedentary

66

work. See 20 C.F.R. Part 404 Subpart P, App. II, § 201.00(d); 201.00(g). During the hearing, the ALJ asked the vocational expert whether there are any skills that are transferrable in plaintiff's previous occupation as a carpenter, to which she replied, "not to what you would call lighter and definitely not sedentary." (Tr. 77). This suggests that if plaintiff had been defined as approaching advanced age, the criteria of Rule 201.14 might have compelled finding him to be disabled.[14]

In light of Mr. Grace's apparent borderline age, the ALJ should have addressed whether classifying him as a "person closely approaching advanced age" was appropriate and whether it would have altered the outcome of his application.

## CONCLUSION

As noted, there exist a number of evidentiary gaps in the record, and ALJ Lebron committed a number of legal errors. Specifically, in applying the Medical-Vocational Grid rules, he failed to consider plaintiff's eligibility as an individual closely approaching advanced age, failed to apply the treating-

---

[14] Since ALJ Lebron did not examine whether plaintiff's educational background provides for "direct entry into skilled work," it is unclear whether he actually meets the conditions of Rule 201.14.

physician rule, did not explain his reasoning for adopting and discrediting certain expert opinions, and did not examine the effects of plaintiff's medications on his functional capacity, nor did he adequately discuss the combined effects of plaintiff's impairments on his disability status. Accordingly, we conclude that remand for further development of the record is warranted. The alternative remedy of an order directing an award of benefits is not justified, for it is conceivable that with additional evidence the defendant may defensibly conclude that plaintiff is not disabled.

For the reasons stated, we recommend that plaintiff's motion be granted in part, that the Commissioner's motion be denied, and that the case be remanded for further administrative proceedings.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Andrew L. Carter, Room 435, 40 Foley Square, New York, New York,

10007, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).

DATED: New York, New York
       May 21, 2013

                           RESPECTFULLY SUBMITTED,


                           _____
                           MICHAEL H. DOLINGER
                           UNITED STATES MAGISTRATE JUDGE

69

Copies of the foregoing Report and Recommendation have been sent this date to:

Leslie A. Ramirez-Fisher, Esq.
Assistant U.S. Attorney, S.D.N.Y.
86 Chambers Street, 3rd Floor
New York, New York 10007

Irwin B. Silverman, Esq.
166 East Central Avenue
Spring Valley, New York 10977